**James D. JOHNSON, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE, Defendant.**

**No. 1866.**

United States District Court, N. D. Florida, Tallahassee Division.

Sept. 28, 1973.

Kent Spriggs, Philip Parsons, Tallahassee, Fla., Ralph Helge, Pasadena, Cal., for plaintiff.

Clinton Ashmore, Asst. U. S. Atty., Tallahassee, Fla., for defendant.

## OPINION-ORDER

MIDDLEBROOKS, District Judge.

### PRELIMINARY STATEMENT OF THE ACTION

This is a civil action brought pursuant to Title 42, U.S.C.A., Section 2000e–16(c) and the First Amendment. The plaintiff James D. Johnson seeks judicial review of his removal from his position as a part-time postal distribution clerk with the defendant United States Postal Service (hereafter USPS). The gravamen of plaintiff's claim is that he was dismissed solely because of his religious beliefs and thus the defendant USPS denied plaintiff his rights under the Civil Rights Act of 1964, as amended, and under the First Amendment to the United States Constitution. Preliminarily, the Court notes that it is not satisfied that plaintiff has timely filed this lawsuit. Title 42, U.S.C.A., Section 2000e–16(c), explicitly written for employees of the federal government, provides for the filing of a Section 2000e–5 civil action in the United States District Court (1) within thirty (30) days of receipt of notice of final action

taken by an agency (or within thirty (30) days of receipt of notice of an appellate decision of the Civil Service Commission if appeal be sought through the Civil Service Commission Board of Appeals and Review) or (2) *after one hundred and eighty (180) days* from the filing of the initial charge of discrimination with the agency or with the Civil Service Commission until such time as final action may be taken. . . . The plaintiff Johnson filed the instant suit one hundred and ten (110) days *before* receipt of notice of final action by the defendant USPS. Plaintiff also filed this suit one hundred and eighteen (118) days after the initial informal complaint was filed with the Civil Service Commission. Thus, on neither of provisions (1) or (2) above has the plaintiff specifically complied with the statute. Indeed, the Court notes that plaintiff Johnson filed his complaint in this Court only one hundred and thirty eight (138) days after the occurrence of the conduct about which plaintiff is aggrieved. Thus, to the extent plaintiff's claim arises out of Title 42, U.S.C.A., Section 2000e–16(c), this Court is of the view that plaintiff has not prosecuted his claim with the diligence required by that statute. However, since at this date the plaintiff is apprised of the "final agency" disposition of his complaint and since a decision on the merits would be both expedient and fair to the parties, the Court enters the following findings of fact and conclusions of law as may be required by Rule 52, Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. The plaintiff James D. Johnson is a resident of Chattahoochee, Florida. Plaintiff was employed by the defendant USPS from approximately June 1966, until his dismissal on April 29, 1972.

2. The defendant United States Postal Service was established pursuant to Public Law 91–375, August 12, 1970, 84 Statute 720 (Title 39, U.S.C.A., Section 201), as an independent establishment of the executive branch of the government of the United States, having the authority under Section 401(1), Title 39, U.S.C.A., to sue and be sued in its official name.

3. The plaintiff was hired in 1966, and served until his dismissal in 1972, as a "part-time flexible clerk", such classification in essence being work at the discretion of the Postmaster depending upon the needs of the Post Office. No certain amount of hours of work is guaranteed to individuals serving in the capacity held by the plaintiff.

4. The Chattahoochee, Florida, Post Office, at which plaintiff was employed, operated with a total of eight (8) persons as of December 1972. Of the eight employees there was one regular mail clerk, two part-time flexible clerks, one city carrier, one rural carrier, the Postmaster and one assistant to the Postmaster as well as one part-time carrier.

5. According to the testimony of the Assistant Postmaster (transcript p. 36), both part-time clerks and the regular clerk were employed on Saturdays together with two of the three carriers. The testimony indicates that one of the six employees could get Saturday off; such determinations were based on seniority.[1]

6. Sunday at the Chattahoochee Post Office was a nonbusiness day. Carriers did not run and the public did not expect mail to be in their boxes by eight o'clock A.M. Additionally, the Post Office was open only for five (5) hours on Sunday. The character of the work load on Sunday and the work force demanded simply was significantly different than that on Saturday. The requisite manpower and committed facilities were not interchangeable.

7. In the summer of 1971, the plaintiff Johnson became a member of a reli-

---

1. Other factual accounts reveal that there were two regular clerks, two part-time clerks and one temporary clerk. But the essential fact is unaltered, plaintiff was a junior part-time clerk in a minimum staffed postal facility.

gious group which observed Saturday as its Sabbath. Plaintiff thereafter sought to continue his employment with the Postal Service except with arrangements which would allow him to have Saturdays as his permanent day off. Plaintiff had at all previous times worked Saturdays with no objection.

8. It appears to this Court upon review of the record in general and particularly the testimony of the plaintiff in proceedings before the agency, that the Chattahoochee Postmaster did make all reasonable efforts to allow the plaintiff his Saturdays off for religious purposes throughout the summer of 1971.[2]

9. On August 28, 1971, the plaintiff received notice of proposed disciplinary action being taken against him in regard to "failure to report" to work on Saturday, August 14, 1971, and August 28, 1971. On September 10, 1971, plaintiff was notified of the Chattahoochee Postmaster's decision to dismiss him from the Postal Service.

10. On October 12, 1971, the plaintiff appealed to the Regional Director of the Postal Service. Plaintiff's dismissal was reversed due to a procedural defect in the dismissal process; plaintiff had not been informed as to whether or not the charges against him had been sustained.

11. On November 30, 1971, plaintiff was again notified of proposed disciplinary action. Plaintiff was charged with seven (7) "failure to report" violations. Plaintiff was notified on December 10, 1971, of Postmaster Johnson's decision to remove him from the Postal Service effective January 6, 1972.

12. Plaintiff again appealed to the Regional Director of the Postal Service and requested an agency investigation. On March 7, 1972, Mr. John Lindler, the Hearing Officer and Investigator appointed for plaintiff's case, conducted a

hearing on the seven (7) counts of failure to report charged against plaintiff. The following findings were published on March 22, 1972:

"He [plaintiff Johnson] wanted it known that he is a member of the World Wide Church of God and each of the charges came about as a result of his following the tenets and doctrine of his chosen church.

"He [Postmaster Johnson] saw no alternative to the course of action he took and it was not taken with any malicious intent.

"Of the 5 clerk craft employees, 4 are required on Saturdays. The appellant [plaintiff Johnson] is one of the junior employees. Thus he [Postmaster] cannot give him each Saturday off".

13. Accordingly, plaintiff was dismissed from the Postal Service on April 29, 1972. The U. S. Postal Service Board of Appeals and Review affirmed the adverse action on August 16, 1972.

14. On or about June 22, 1972, plaintiff filed a "discrimination" charge against Postmaster Johnson with the Equal Employment Opportunity Officer. A complaints examiner assigned by the U. S. Civil Service Commission made the following findings:

"No discrimination because of religion could be found in this allegation. The small amount of employees at the Chattahoochee Post Office would not allow an hourly rate employee, who replaces regular employees, such as Mr. Johnson to be scheduled off the same day every week. Mr. Johnson was given Saturdays off as often as the other hourly rate employees. . . ."
. . . "

15. On December 5, 1972, in furtherance of plaintiff's appeal from the findings by the EEO investigator, plaintiff was granted a special hearing with re-

---

2. Transcript, page 17:
   A: The Postmaster said that he would give me as many Saturdays as he possibly could.
   Q: Did this actually happen?

A: Yes sir, he gave me, I don't recall how many, but I would say the majority of Saturdays off".
   *      *      *      *      *

gard to the religious discrimination complaint. The finding by the complaints examiner for the U. S. Civil Service Commission was simply that "the evidence does not support the complaint". All agency action with regard to plaintiff's claims terminated January 2, 1973.

16. Meanwhile, the complaint in this Court had been filed on September 14, 1972, such filing being one hundred ten (110) days before final agency action and only one hundred eighteen (118) days after initial filing with the Civil Service Commission.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of and the parties to this action.

2. Plaintiff contends herein that his dismissal from the Postal Service for his failure to report for Saturday work assignments violates rights guaranteed by the First Amendment to the United States Constitution and by the Civil Rights Act of 1964, as amended.

3. To the extent that plaintiff's claim is before this Court pursuant to the authority of Title 42, U.S.C.A., Section 2000e–16(c), the Court should note the scope of review to which plaintiff is entitled. The law of this Circuit was explicitly defined by Judge Gewin in Beverly v. Lone Star Lead Construction Corp., 437 F.2d 1136 at 1141 (5th Cir. 1971):

> "We will not permit the single finding of this investigatory agency to stand as a complete defense which precludes all hope of adversary adjudication or remedial action in the courts."

At page 1142:

> "Title VII itself implicitly recognizes this fact by provisions which (1) assume the existence of the powers of the courts to make independent *de novo* rulings and (2) afford no binding weight to Commission actions."

However, the trial *de novo* is not *required* in all cases. In the reasoned opinion of Judge Gesell in Hackley v. Johnson, 360 F.Supp. 1247, District of Columbia, 1973 [Civil Action No. 1258–72, July 13, 1973]:

> "If it [the District Court] determines that an absence of discrimination is affirmatively established by the clear weight of the evidence in the record, no new trial is required. If this exacting standard is not met, the Court shall, in its discretion, as appropriate, remand, take testimony to supplement the administrative record, or grant the plaintiff relief on the administrative record."

In the instant case the Court has for its consideration a complete administrative record in which appears two transcribed hearings afforded the plaintiff and the findings of numerous investigations for both the Postal Service and the United States Civil Service Commission. Additionally, the Court notes that the parties have had occasion to offer supplementary factual matter for consideration by the Court. But since the Court is of the view that the record does not support a finding of discrimination a *de novo* review is not necessitated. The Court will however, view the record as supplemented by the parties to determine whether plaintiff has any basis for relief; such a viewing shall not be restricted in any manner to the earlier administrative rulings.

4. In regard to plaintiff's claim herein which is that the action of dismissal is violative of his First Amendment rights, we look now to that repository of civil rights which provides in pertinent part:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."

Speaking for the Supreme Court in Walz v. Tax Commission, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970) Chief Justice Burger observed as to this clause that:

> "The general principle deducible from the First Amendment and all

42

that has been said by the Court is this: that we will not tolerate either governmentally established religion or government interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference".

However, since Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), it has also been recognized that while "[t]he Constitution protects the right to have and to express beliefs, it does not blindly afford the same absolute protection to acts done in the name of or under the impetus of religion".

■ The regulations which governed the actions of the defendant Postal Service, 5 C.F.R., Section 713.204(f) provide in part that an agency shall:

"Make reasonable accommodations to the religious needs of applicants and employees, including the needs of those who observe the Sabbath on other than Sundays, when those accommodations can be made without undue interference with the business of the agency or with the rights of other applicants or employees".

And since the law of this Circuit places the burden upon the employer to show that it was reasonably unable to accommodate the employee's religious practice without undue hardship on the employer's business, Riley v. Bendix Corp., 464 F.2d 1113, 5th Cir. 1973, this Court must now look to the evidence presented by the defendant USPS.

■ 5. The evidence is undisputed that the Chattahoochee Post Office functioned with a minimum number of employees of which only five (5) at the

most, including the plaintiff, were in the clerk craft.[3] Viewing the testimony most favorable to plaintiff there were but two regular clerks, two part-time clerks (one of whom was plaintiff) and one temporary clerk. According to the testimony of the Assistant Postmaster (who is presently the Postmaster) and the plaintiff, Saturday duty required a minimum of three to four clerks in addition to the carrier personnel. Plaintiff has seniority only over the temporary clerk and the second part-time clerk. The inescapable conclusion is that to grant plaintiff's request would mandate that at least one senior regular employee be subordinate to the schedule of a part-time non-senior employee. At the very least such an accommodation for the plaintiff would inconvenience other workers. More importantly it would frustrate the program of using part-time help at the discretion of the Postmaster for the peak business hours of a small postal service.

6. The Court is convinced beyond doubt that the defendant USPS simply did not have the manpower to accommodate plaintiff's request. The Court does not suggest that plaintiff's complaint was specious or conceived in a sense of vexation. Certainly the testimony indicates a convivality on the part of the Chattahoochee postal employees and a good faith effort on their part to accommodate the plaintiff. The simple fact which places this factual situation squarely within the exception, which is not contested, is that the Chattahoochee Post Office operates on a limited scale with a minimal number of employees and facilities. The requisite manpower does not exist to accommodate plaintiff. It is, therefore,

Ordered that judgment in this matter shall be entered disposing of the issues raised in the pleadings in favor of the defendant.

3. See footnote #1, supra.